**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**KRISTY L. BOLIN-MCNEELY,**            )
                                         )
             **Plaintiff,**              )
                                         )
**vs.**                                  )          **Case No. 15-cv-302-CVE-TLW**
                                         )
**CAROLYN W. COLVIN,**                   )
**Acting Commissioner of Social Security,** )
                                         )
             **Defendant.**              )

<u>**REPORT AND RECOMMENDATION**</u>

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Kristy L. Bolin-McNeely seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

**ISSUES**

On appeal, plaintiff raises five points of error. First, plaintiff argues that the ALJ's residual functional capacity ("RFC") findings are insufficient to address moderate limitations in concentration, persistence, and pace. (Dkt. 17). Second, plaintiff argues that the ALJ failed to include limitations resulting from plaintiff's obesity in the RFC findings. <u>Id.</u> Third, plaintiff contends that the RFC findings are not supported by substantial evidence because the ALJ improperly evaluated the medical opinion evidence. <u>Id.</u> Fourth, plaintiff argues that the ALJ did not make proper credibility findings. <u>Id.</u> Fifth, plaintiff contends that the ALJ did not ensure that the vocational expert's testimony was consistent with the <u>Dictionary of Occupational Titles</u> (DOT) and that one of the jobs listed is incompatible with the ALJ's RFC findings. <u>Id.</u>

## STANDARD OF REVIEW

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his or her alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the

steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 33-year old female, filed for Title XVI benefits on April 25, 2012, alleging a disability onset date of June 20, 2010. (R. 104-09). Plaintiff claimed that she was unable to work due to schizoaffective disorder, generalized anxiety, borderline personality, and fibromyalgia. (R. 133). Plaintiff's claims for benefits were denied initially on February 9, 2012, and on reconsideration on August 13, 2012. (R. 61-64, 67-70, 72-74). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on September 30, 2013. (R. 43-60). The ALJ issued a decision on November 20, 2013, denying benefits. (R. 17-42). The Appeals Council denied review, and plaintiff appealed. (R. 1-6; dkt. 2).

**The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since August 29, 2011, her application date. (R. 22). Plaintiff has severe impairments of "fibromyalgia; obesity; associated arthritic pain in the back, hips, and knees; coronary artery disease; schizoaffective disorder; [and] generalized anxiety disorder." Id. The ALJ found that plaintiff's headaches and sleep apnea were non-severe impairments. Id.

Plaintiff did not meet or medically equal a listing. (R. 23). In considering the severity of plaintiff's mental impairments, the ALJ applied the special technique using the "paragraph B" criteria. Id. The ALJ found that plaintiff has moderate limitations in the areas of activities of daily living; social functioning; and concentration, persistence, and pace. (R. 23-25). Plaintiff had not experienced any episodes of decompensation. (R. 25).

The ALJ then reviewed plaintiff's testimony and the medical evidence. Plaintiff testified that she has issues with her heart and gets chest pains with activity or "if she bends over too much." (R. 27). She is only able to sit and use her hands for thirty minutes before she experiences back spasms and numbness in her arms and legs. Id. She is only able to stand for ten or fifteen minutes before she "get[s] pins and needles" in her legs. Id. Plaintiff also has pain from fibromyalgia. Id. She also complained of constant headaches, which last for weeks at a time and are relieved only with shots given at the hospital. Id. Plaintiff also receives mental health treatment but was looking for a new provider at the time of the hearing. Id.

The medical records indicate that plaintiff's treating neurologist, Dr. David Ewing, diagnosed plaintiff with fibromyalgia and opined that fibromyalgia and obesity cause her to experience low back pain. (R. 27-28). Dr. Ewing's treatment notes also state that plaintiff has difficulty walking, standing, and lifting. (R. 28). The ALJ then reviewed multiple records in

4

which plaintiff had complained of pain throughout her body, including her low back, joints, head, and knee. Id. The ALJ concluded that the record definitively established that plaintiff suffers from fibromyalgia and associated symptoms. Id.

The objective medical testing showed signs of early osteoarthritic changes in plaintiff's left knee in October 2009. Id. A February 2010 x-ray showed mild spondylosis of the lumbar spine. (R. 29). A May 2010 MRI of the lumbar spine "showed desiccation of the disc tissue of no significance." (R. 28). In November 2011, a CT of the cervical spine revealed "degenerative disc disease, spondylosis, uncinated arthrosis, and central canal stenosis." (R. 29). Plaintiff's left knee had "mild joint space narrowing with subchondral sclerosis and osteophytosis of the medial and pattellofemoral compartments of the knee" in March 2012. Id. In April 2012, another lumbar x-ray showed "mild generalized lumbar spondylosis and mild facet joint arthropathy." Id. Plaintiff also had an x-ray of her right knee in April 2012, which revealed "mild to moderate osteoarthritis." Id.

Plaintiff underwent a consultative examination in December 2011. Id. That exam showed that at 5'9" and 336 pounds, plaintiff was obese. Id. Her arm, leg, and grip strength measured 4/5. Id. Plaintiff was able to oppose her thumb and fingertips and manipulate small objects "effectively," and her ability to grasp tools was present but "weak." Id. Plaintiff demonstrated pain and tenderness to palpation in her neck and back. Id. She had slight difficulty with toe walking and could not walk on her heels due to heel pain. Id. Plaintiff reported a history of headaches that the physician likened to tension headaches. Id. The ALJ gave great weight to these medical findings and noted that the records indicate that plaintiff showed "some improvement" with treatment for each of the diagnoses listed in the consultative examiner's report. Id.

Dr. Muzaffar Hussain, an orthopedist, treated plaintiff for three years between February 2010 and February 2013. Id. He prescribed pain medication and administered injections into plaintiff's hips, back, and knees to treat pain. Id. Dr. Hussain opined that plaintiff was not a good surgical candidate and attributed most of her issues to her obesity. Id. Based on Dr. Hussain's records, the ALJ found that plaintiff's "pain does affect the quality of her life, and her sleep." Id.

Plaintiff's neurologist, Dr. Ewing, began treating plaintiff in June 2010 for headaches, neck pain, and sleep apnea. Id. In December 2010, Dr. Ewing noted that he suspected plaintiff had fibromyalgia, but he also noted that plaintiff exhibited "significant somatization," particularly with respect to her back pain. (R. 30). Dr. Ewing also noted plaintiff's obesity and added it as a diagnosis. Id. When plaintiff's fibromyalgia symptoms – pain in the arms and legs, fatigue, memory loss, and numbness – increased in February 2011, Dr. Ewing discontinued Topamax, which he had prescribed for headaches, and began prescribing Lyrica, which improved plaintiff's headaches. Id. In November 2012, Dr. Ewing reported that plaintiff was experiencing increased depression, headaches, and low back pain, but he also found that plaintiff was noncompliant both with sleep apnea treatment and with her weight loss efforts. Id. By April 2013, plaintiff had begun losing weight, and Dr. Ewing found that plaintiff had less pain in her arms and legs, fewer headaches, less neck and shoulder pain, improved mobility, and improved fibromyalgia symptoms. Id.

Plaintiff first sought treatment for her cardiac issues in August 2012. Id. Initial testing led doctors to believe that plaintiff had significant coronary artery disease, but subsequent tests led to a diagnosis of mild-to-moderate coronary artery disease, which was treated successfully with nitroglycerin and calcium channel blockers. Id. Plaintiff had stopped taking her medication by

April 2013 but reported no chest pain. Id. At that time, her cardiologist prescribed new medications. Id.

Plaintiff received mental health treatment through a community center beginning in September 2010. (R. 31). She received individual therapy, individual rehabilitation, medication, and case management, which led to improved symptoms. Id. Plaintiff stopped treatment in June 2012 to begin treatment at another center, but she did not start treatment again until 2013. Id. The ALJ noted that plaintiff's attendance was not consistent. Id. Her symptoms "have fluctuated in intensity and frequency," but she did see "modest relief" with treatment. Id. Plaintiff's psychiatric treatment notes reveal a number of medication changes over the course of treatment and evidence that plaintiff also used marijuana occasionally. Id. Plaintiff's treating psychiatrist noted serious symptoms through a GAF score of 45 in April 2012, but by June 2012, the date plaintiff terminated her treatment, her GAF score had improved to 51, a sign that she experienced moderate symptoms. Id.

Plaintiff also underwent two consultative examinations with Dr. Derrise Garner. (R. 32). The first, in January 2011, indicates a diagnosis of schizoaffective disorder, bipolar type; generalized anxiety disorder; learning disorder, provisional; and borderline personality disorder, provisional. Id. Dr. Garner assigned a GAF score of 45 (serious symptoms). Id. However, Dr. Garner opined that plaintiff could work and listed specifically plaintiff's abilities and limitations, which included simple tasks and limited contact with the public. (R. 33-34). In November 2011, Dr. Garner found that plaintiff had only schizoaffective disorder, bipolar type and generalized anxiety disorder, with a slightly improved GAF score of 48. (R. 32). However, Dr. Garner found that plaintiff's ability to work had expanded, allowing plaintiff to handle moderately complex tasks and to have limited contact with the public. (R. 33). The ALJ gave great weight to Dr.

Garner's opinions, but he relied more on her narrative opinions than the GAF scores, which received only some weight. (R. 34-35). As the ALJ stated, the GAF scores represented only a snapshot in time and the severity of plaintiff's symptoms "do not correlate directly to a finding of disability." (R. 35).

The ALJ noted that the agency psychologists relied on Dr. Garner's findings in reaching their conclusions, and the ALJ gave their conclusions "determinative weight." (R. 34). The ALJ also cited the physical assessments from the agency physicians, which noted a decline in plaintiff's health. Id. The initial assessment found that plaintiff could do some medium work, but the final agency assessment, completed by Dr. Luther Woodcock, found that plaintiff could only perform sedentary work. Id. The ALJ gave determinative weight to Dr. Woodcock's opinion, finding that it was based on the most complete medical record. Id.

The ALJ also found that plaintiff was not entirely credible. (R. 32). The ALJ relied on plaintiff's weak work history and inconsistencies between her testimony and reports to the Commissioner and her statements to her doctors. Id. For example, plaintiff denied having issues with substance abuse to Dr. Garner in January 2011, but she told Dr. Garner in November 2011 that she had occasionally smoked marijuana. Id. Plaintiff also sought emergency treatment for symptoms that mirrored a bad drug interaction in March 2013, and toxicology reports showed that plaintiff tested positive for substances that she was not prescribed. Id. The ALJ noted inconsistencies between plaintiff's testimony about her inability to use her hands and the consultative examiner's findings that plaintiff's grip and grasp was only slightly diminished. (R. 29). The ALJ also discounted reports from plaintiff's mother that plaintiff could not leave the house alone because plaintiff consistently attended mental health appointments by herself. (R. 31).

The ALJ concluded that plaintiff retained the RFC to perform sedentary work with additional limitations. (R. 26). Plaintiff was limited to occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling. Id. Mentally, plaintiff was limited to "simple, repetitive tasks," superficial contact with co-workers and supervisors, and no contact with the public. Id.

Plaintiff did not have past relevant work, but based on the testimony of a vocational expert, the ALJ found that plaintiff could perform such jobs as assembler, clerical mailer, and escort driver. (R. 36). Accordingly, the ALJ concluded that plaintiff was not disabled.

**Plaintiff's Medical Records**

Because plaintiff does not challenge the ALJ's interpretation of the medical evidence, discussion of plaintiff's medical records is limited to those issues relevant to the analysis section of this report and recommendation.

## ANALYSIS

**Moderate Limitations in Concentration, Persistence, and Pace**

Plaintiff argues that the ALJ's limitation to unskilled work and "simple, repetitive tasks" is insufficient to accommodate the ALJ's step two "paragraph B" finding that plaintiff has moderate limitations in concentration, persistence, or pace. (Dkt. 17). The Commissioner argues that the ALJ's finding that plaintiff could perform "simple, repetitive tasks" was a proper reflection of the paragraph B findings. (Dkt. 19). The Commissioner also argues that plaintiff's reliance on unpublished cases is improper, as the Tenth Circuit recently held that a limitation on unskilled work is proper when a claimant has a moderate limitation in concentration, persistence, and pace. Id. (citing Vigil v. Colvin, 805 F.3d 1199, 1204 (10th Cir. 2015)).

Plaintiff cites a string of cases for the proposition that the limitation to "simple, repetitive tasks" is insufficient to address a moderate limitation in concentration, persistence, and pace. (Dkt. 17). The Tenth Circuit addressed this question in Jaramillo v. Colvin, 576 F. App'x 870 (10th Cir. 2014) (unpublished).[1] In Jaramillo, the Tenth Circuit rejected a limitation to "simple, routine, repetitive, and unskilled tasks" as a proper explanation, using work-related functions, to account for limitations caused by the claimant's mental impairments. 576 F. App'x at 874-75. The court relied on SSR 85-15, which defines "the basic mental demands" of unskilled work to include the ability to handle "simple instructions." SSR 85-15. However, the court explained that "a limitation to unskilled work or, as the ALJ phrased it here, 'unskilled tasks,' *could* be used as shorthand for the specific mental abilities described in SSR 85-15," as opposed to a limitation on a claimant's work-related mental function that exists as a result of a mental impairment. Jaramillo, 576 F. App'x at 875 (emphasis added).

Similarly, in Wayland v. Chater, 1996 WL 50459 (10th Cir. Feb. 7, 1996) (unpublished), the Tenth Circuit found that limiting the claimant to unskilled work did not address moderate limitations in social functioning where the claimant "often" had issues with concentration, persistence, and pace due to depression and personality disorder. 1996 WL 50459 at *1. Nonetheless, the Tenth Circuit also stated that "there may be circumstances in which a particular mental limitation could be so obviously accommodated by a reduction in skill level that particularized vocational evidence addressing that limitation might be dispensed with . . . ." Id. at *2.

More recently, the Tenth Circuit addressed this question in the published case cited by the Commissioner, Vigil, 805 F.3d 1199. In Vigil, the Tenth Circuit concluded that a limitation

---

[1] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

to unskilled work, without particularized vocational evidence, is proper if supported by the evidence. See 805 F.3d at 1204. Vigil is consistent with the other cases addressed above and, as a published case, is controlling here. Thus, the question is whether the ALJ's limitation on plaintiff's work to simple, repetitive tasks is supported by the evidence.

In this case, plaintiff does not argue that the record supports a more restrictive RFC finding as a result of the ALJ's finding that plaintiff has moderate limitations in the area of concentration, persistence, and pace. (Dkt. 17). Instead, plaintiff argues that, as a general principle of law, a limitation to "simple, repetitive tasks" is insufficient. However, as the Tenth Circuit stated in Vigil and in many prior unpublished decisions, whether or not a limitation to "simple, repetitive tasks" is sufficient to account for a mental impairment depends on the record in each case.

Turning to the record evidence, the undersigned finds that the ALJ's decision to limit plaintiff to "simple, repetitive tasks" is supported by substantial evidence and accommodates plaintiff's moderate mental limitations. In finding that plaintiff has moderate limitations in concentration, persistence, and pace, the ALJ relied on Dr. Garner's November 2011 consultative examination report, which found "no evidence of organicity or significant problems with the claimant's attention or memory." (R. 25). The ALJ also noted that plaintiff performed "better on memory and concentration testing" during the second examination in November 2011 than she had in January 2011. Id. In formulating plaintiff's RFC, the ALJ again relied on Dr. Garner's specific findings, giving them great weight. (R. 33-34). Dr. Garner found, both in January 2011 and November 2011, that plaintiff could perform simple tasks. Id. In fact, in November 2011, Dr. Garner opined that plaintiff could perform "moderately complex tasks." (R. 33). The ALJ also determined that the agency psychologists' opinions, which relied in part on Dr. Garner's

examinations, were entitled to determinative weight. (R. 34). In January 2011 and February 2012, agency psychologists opined that plaintiff could perform simple tasks. (R. 272-75, 496-99, 634). Accordingly, the evidence clearly establishes that the ALJ's conclusions in this respect are supported by substantial evidence, and the ALJ did not err in finding that plaintiff's moderate limitation in concentration, persistence, and pace translated to an ability to perform "simple, repetitive tasks."

**Obesity**

Plaintiff argues that the ALJ found her obesity to be a severe impairment at step two but failed to include any limitations related to obesity in his RFC findings. (Dkt. 17). The Commissioner argues that the ALJ did address plaintiff's obesity at step four, citing the ALJ's reliance on Dr. Woodcock's opinion, which specifically references plaintiff's obesity.

In his decision, the ALJ discussed plaintiff's obesity throughout his evaluation of plaintiff's physical RFC. The ALJ cited treating neurologist, Dr. Ewing, who attributed plaintiff's low back pain to a combination of fibromyalgia and obesity. (R. 27). The ALJ also discussed the findings of plaintiff's treating orthopedist, Dr. Hussain, who opined that the pain in plaintiff's hips, back, and knees, was due, in large part, to her obesity. (R. 29). The ALJ acknowledged that plaintiff's pain stemmed from her obesity and impacted both her "quality of life, and her sleep." Id. The ALJ also noted that when plaintiff did lose weight, her pain levels decreased. (R. 30).

In considering obesity, "[a]n ALJ must consider 'the combined effects of obesity with other impairments' and 'evaluate each case based on the information in the case record.'" Arles v. Astrue, 438 F. App'x 735, 740 (10th Cir. 2011) (quoting SSR 02-1p) (unpublished). Although plaintiff is technically correct in stating that the ALJ did not specify which limitations in the RFC

are attributable to plaintiff's obesity, it is clear that the ALJ found plaintiff's obesity impacted her ability to stand and walk. It is also clear that the ALJ considered the mental impact of plaintiff's obesity, insofar as it affected her "quality of life, and her sleep." Thus, the ALJ did consider the "combined effects of [plaintiff's] obesity." Furthermore, even if the ALJ's analysis is not pristine, the Tenth Circuit has held that where "we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." Keyes-Zachary v. Astrue, 695 F.3d 1156, 1166 (10th Cir. 2012). Following the ALJ's reasoning here is not difficult. Finally, in assessing plaintiff's RFC, the ALJ noted that he had considered all of plaintiff's symptoms (R. 26), and he concluded that plaintiff's obesity would not prevent her from performing sedentary work (R. 32). The Court is permitted to "take the ALJ at his word" when he states that he has considered all the evidence. Wall v. Astrue, 561 F.3d 1048, 1070 (10th Cir. 2009). For these reasons, the undersigned recommends a finding of no error on this issue.

**Substantial Evidence – Medical Opinion Evidence**

Plaintiff argues that the ALJ's RFC findings are not supported by substantial evidence because the ALJ erred in evaluating the medical opinion evidence. (Dkt. 17). Plaintiff contends that the ALJ failed to resolve the inconsistencies between Dr. Garner's GAF scores and her narrative opinion; that the agency medical opinions were "too remote" in time from the decision and not based on a proper review of the medical evidence; that the ALJ failed to weigh Dr. Hussain's opinion; and that Dr. Woodcock's opinion, which the ALJ gave determinative weight, was not reliable because it failed to consider a number of severe impairments. Id. The Commissioner contends that the ALJ properly evaluated all of the evidence in assessing plaintiff's RFC. (Dkt. 19).

**GAF Scores**

The Tenth Circuit has held that GAF scores may be helpful in formulating RFC findings, but they are not essential components of accurate findings. See Zachary v. Barnhart, 94 F. App'x. 817, 819 (10th Cir. 2004) (unpublished) (citing Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002)). The Tenth Circuit has also held that GAF scores are only one piece of evidence to be considered and are particularly unhelpful when the source who assigns the score fails to explain the reasons for the rating. See id. As the court noted in Lopez v. Barnhart, 78 F. App'x 675, 678 (10th Cir. 2003) (unpublished), GAF scores "may indicate problems that do not necessarily relate to the ability to hold a job. Thus, standing alone, the GAF score does not evidence an impairment seriously interfering with [a] claimant's ability to work." Most recently, the Tenth Circuit noted, "the new Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed., 2013) has discontinued its use because of '[the scores'] conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Krchmar v. Colvin, 548 F. App'x 531, 534 n.2 (10th Cir. 2013).

Here, the ALJ not only discussed the GAF scores, he gave valid, specific reasons for choosing not to rely on them in assessing plaintiff's RFC. The ALJ's reasoning is clear – he gave more weight to the narrative opinion from Dr. Garner regarding plaintiff's specific abilities and limitations than to the GAF scores, which he correctly identified as a snapshot in time. The undersigned recommends a finding of no error on this point.

**Agency Opinions**

Plaintiff cites no authority for the proposition that an agency physician's opinion can never be given controlling weight. See generally 20 C.F.R. § 416.927 (setting out the hierarchy of opinions and the factors to consider in weighing opinions). The regulations do provide,

however, that treating physicians opinions are "generally" entitled to more weight than examining physicians or non-examining agency physicians. Id. Plaintiff explicitly challenges the physical RFC assessments of the agency physicians, arguing that they are too remote in time, not based on a proper review of the record evidence, and fail to include an explanation to support their conclusions.

Regarding the remoteness of the opinions, plaintiff alleges that she became disabled on June 20, 2010, although by virtue of her filing a Title XVI application, she cannot be entitled to benefits before the month following her application date. See 20 C.F.R. §§ 416.335, 416.501. The ALJ reviewed the medical evidence relevant to the time period in which plaintiff alleged she became disabled, which included the agency physicians' opinions. Accordingly, the agency opinions are not remote, but their value can be dependent upon the medical evidence that forms the basis of each opinion. The ALJ addressed that issue specifically, noting that plaintiff's medical records showed a decline in the scope of work she could perform and that the agency opinions reflected the medical records. (R. 34). The first agency opinion stated that plaintiff could perform medium work, the second opinion stated that plaintiff could perform light work, and the third opinion, Dr. Woodcock's opinion, stated that plaintiff was limited to sedentary work. (R. 34, 276-83, 514-21, 634, 640, 703-10).

More importantly, the ALJ did not reject any of the treating physicians' opinions in adopting Dr. Woodcock's opinion that plaintiff was limited to sedentary work. The ALJ found that "[t]he state agency, expert opinions are balanced, objective, and consistent with the evidence as a whole." (R. 34). The ALJ did explicitly find that the consultative examining opinions, both physical and psychological, were consistent with the agency opinions. Id.

The ALJ explained his reasons for giving controlling weight to Dr. Woodcock's agency opinion, and he did not reject any other medical opinion evidence in so doing. "When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004). Accordingly, the ALJ's reasoning is sufficient and is supported by substantial evidence. The undersigned recommends a finding of no error on this issue.

**Dr. Hussain's Opinion**

Plaintiff argues that the ALJ did not weigh Dr. Hussain's opinion, even though he was plaintiff's treating orthopedist. (Dkt. 17). Plaintiff does not identify any specific opinion that Dr. Hussain rendered in making this argument. Id.

The ALJ discussed Dr. Hussain's treatment records in detail, noting that Dr. Hussain targeted plaintiff's hip, back, and knee pain. (R. 29). Based on those records, the ALJ found that plaintiff's "pain does affect the quality of her life, and her sleep." Id. The failure to assign a weight to a treating physician's opinion does not always constitute reversible error. See Kruse v. Astrue, 436 F. App'x 879, 882–83 (10th Cir. 2011) (unpublished) (holding that the ALJ did not commit reversible error in failing to "state a specific weight" attached to a treating physician's opinion where the ALJ's explanation made it clear that the ALJ attached little weight to the opinion).

The same reasoning that supports the weight given to Dr. Woodcock's opinion also applies to the ALJ's treatment of Dr. Hussain's opinion. See Howard, 379 F.3d at 947. It is clear that the ALJ accepted the findings Dr. Hussain made and acknowledged that the treatments were necessary to address plaintiff's pain. Accordingly, the undersigned recommends that the ALJ's failure to assign a specific weight to Dr. Hussain's opinions is harmless error.

**Dr. Woodcock's Opinion**

Plaintiff argues that Dr. Woodcock's opinion is not reliable because Dr. Woodcock based his RFC assessment on plaintiff's arthritis only and did not consider her severe impairments of fibromyalgia, obesity, or coronary artery disease. (Dkt. 17). Plaintiff misstates the evidence. Dr. Woodcock discussed the evidence of fibromyalgia, which he identified as joint pain, in discussing the records of Drs. Weigman and Hussain, including Dr. Hussain's findings of "multiple trigger points." (R. 704-05). Dr. Woodcock also made a finding that plaintiff's "obesity does affect the rfc [sic]." (R. 70).

Plaintiff is correct in stating that Dr. Woodcock did not discuss plaintiff's coronary artery disease. However, plaintiff does not argue what functional limitations, if any, result from her coronary artery disease that would be inconsistent with Dr. Woodcock's limitation to sedentary work. Additionally, the ALJ found that plaintiff's diagnosis was for "mild-to-moderate" disease treatable with medication. (R. 30). The ALJ also found that plaintiff was not compliant with her medication and was asymptomatic even without medication. (R. 30, 32-33).

For these reasons, the undersigned finds that Dr. Woodcock's opinion accurately reflects the medical evidence and recommends a finding of no error on this issue.

**<u>Credibility</u>**

Plaintiff argues that the ALJ's reasons for finding plaintiff not entirely credible are not supported by substantial evidence. (Dkt. 17). Specifically, plaintiff argues that the record contradicts the ALJ's conclusions that plaintiff took medication not prescribed to her, lied about her marijuana use, and has limiting activities of daily living. <u>Id.</u>

This Court is not to disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the

finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

As the ALJ stated in his decision, plaintiff was admitted to the hospital in March 2013 for "slurred speech, altered mental state and disorientation." (R. 32, 821). Although plaintiff denied using drugs not prescribed to her, the hospital reported that she tested positive for benzodiazepines and tricyclics, "neither of which she is prescribed." Id. Plaintiff argues that she was taking Doxepin, Nortriptyline, and Klonopin, all of which would explain the positive toxicology report. (Dkt. 17). Plaintiff was prescribed those medications, but the record evidence shows that she was taking these medication in March, April, and September 2012, not in 2013. (R. 171, 182, 207, 781, 783, 815). Further, those medications were *not* on the list of prescribed medications that plaintiff reported to the hospital at the time of her admission. (R. 821). The ALJ's finding that plaintiff used prescription medication not prescribed to her, then, is supported by the record.

The record also supports the ALJ's finding that plaintiff lied to Dr. Garner about using marijuana. The ALJ found that plaintiff first reported using marijuana in September 2010,

several months before she denied using marijuana to Dr. Garner in January 2011. (R. 32, 369). Accordingly, the ALJ's conclusion that plaintiff lied to Dr. Garner is supported by the record.

Plaintiff's reports of activities of daily living are also not supported by the record. The ALJ notes discrepancies between plaintiff's reports of limited activities of daily living and her actual activities of daily living throughout the opinion. For example, at step two, the ALJ noted that plaintiff's function reports were inherently contradictory, as plaintiff claimed she needed help and reminders to do things but was still able to care for her children, take her medications, do some chores, and attend doctor appointments. (R. 24). The ALJ noted similar discrepancies in plaintiff's ability to go out alone. (R. 25). The ALJ further found that the medical evidence did not match plaintiff's description of limited activities of daily living in her hearing testimony. (R. 27, 32). Plaintiff does not dispute the ALJ's interpretation of the facts; she simply argues that the ALJ did not properly consider her limited activities of daily living.

For these reasons, the undersigned recommends a finding of no error on this issue.

**Step Five Errors**

Plaintiff argues that the ALJ committed reversible error in failing to ask the vocational expert whether her testimony was consistent with the <u>DOT</u>. (Dkt. 17). Plaintiff also argues that the job of escort driver requires more contact with others than the RFC findings allow. <u>Id.</u> Plaintiff further argues that even the unskilled jobs that the ALJ cited at step five are not consistent with the limitations in the medical opinions because they require plaintiff to "apply 'commonsense understanding to carry out *detailed*' but uninvolved written or oral instructions." (Dkt. 17 at 10).

During the hearing, the ALJ did not ask the vocational expert whether her testimony was consistent with the <u>DOT</u>. Failure to make the inquiry, however, is harmless error if no conflicts

exist. See Poppa v. Astrue, 569 F.3d 1167, 1173 (10th Cir. 2009). Here, plaintiff argues that

there is a conflict between the vocational expert's testimony and the DOT with respect to the job

of escort driver because that job requires frequent interaction with others.[2] (Dkt. 17). The

description of the escort driver job is as follows:

> Drives vehicle equipped with warning lights and signs to escort trucks hauling
> mobile homes on public thoroughfares: Precedes escort and maintains specified
> distance between pilot vehicle and escort to provide warning to other motorists
> and to clear traffic at locations. Communicates by two-way radio with truck
> and other pilot vehicle drivers to coordinate changes in speed and route,
> emergencies, or traffic congestion.

See http://www.occupationalinfo.org/91/919663022.html (last visited July 19, 2016). Even if the

Court assumes that the duty of communicating with the other drivers constitutes more than

superficial contact, thereby exceeding the limits of the ALJ's RFC findings, the error is harmless

because the other two jobs listed in the ALJ's decision exist in significant numbers to support the

ALJ's conclusion that plaintiff can perform other work. See Raymond v. Astrue, 621 F.3d 1269,

1274 (10th Cir. 2009) (holding that where the vocational expert described two jobs that exceeded

the claimant's physical capacity as defined by the ALJ, the error was harmless because the third

job existed in significant numbers to satisfy the ALJ's duty). According to the vocational

expert's testimony, there are 93,000 assembler jobs and 42,000 clerical mailer jobs in the

national economy. (R. 35, 59). Plaintiff does not challenge this portion of the vocational expert's

testimony, and the undersigned finds that these two remaining jobs are sufficient to establish that

other work exists in significant numbers in the national economy that plaintiff can perform.

---

[2] Plaintiff's argument can be interpreted two ways: (1) that the vocational expert's testimony
conflicts with the DOT; or (2) that the vocational expert's testimony is consistent with the DOT
but exceeds the ALJ's RFC findings. In this case, the DOT discusses "frequent" communication,
but given the nature of the job, it appears that such communication would still meet the
definition of "superficial" as stated in the ALJ's findings. However, out of an abundance of
caution, the undersigned addresses the argument as though "frequent" and "superficial" contact
are mutually exclusive concepts.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision in this case be **AFFIRMED**.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Federal Rule of Civil Procedure 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by August 10, 2016.

If specific written objections are timely filed, Federal Rule of Civil Procedure 72(b)(3) directs the district judge to

> determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Id.; see also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 27th day of July, 2016.

_____
T. Lane Wilson
United States Magistrate Judge